UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

ACTION NO.:

| | |
|---|---|
| Land Trust No. 2020 Continental Avenue, #221, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>Watson Realty Corp., Premiere Plus Realty Co.; MVP Realty Associates, LLC; Higher Tech Realty FL, LLC; Florida Homes Realty & Mortgage LLC; Downing-Frye Realty, Inc.; Charles Rutenberg Realty, Inc.; Smith & Associates Real Estate, LLC; Michael Saunders & Company; and DOES 1 through 50, inclusive,<br><br>    Defendants. | |

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Land Trust No. 2020 Continental Avenue, #221 ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against the Defendants, and alleges as follows:

## NATURE OF THE LAWSUIT

1.      This case alleges a nationwide conspiracy between the real estate broker Defendants and their co-conspirators, including the National Association of Realtors ("NAR"), to restrain trade by adopting, implementing, and enforcing anticompetitive Multiple Listing Service ("MLS") rules that require Plaintiff and Class Members[1] to pay buyer broker fees and inflated commissions on home sales in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

2.      Selling a home is among the most important financial decisions a person will make in his or her life. It can mean a family is growing and needs a larger home, a job change requires relocation, or a couple are retiring and looking to downsize to a smaller home. Regardless of the decision, selling a home is a significant financial transaction.

3.      The vast majority of home sales in the United States involve real-estate brokers, costing home sellers and buyers some $100 billion in broker fees annually.[2]

4.      Plaintiff, a home seller, brings this action on behalf of itself and all others similarly situated against several of the largest real estate brokerages in Florida (collectively, "Defendants") for conspiring to enforce anticompetitive MLS rules that cause home sellers to pay inflated commissions in connection with the sale of their homes.

5.      An MLS is a database of properties listed for sale in a particular geographic region

---

[1] The Class Members and Class Period are defined below in paragraph 123.
[2] "Time to take a wrecking ball to realtors' fees in America," The Economist (Nov. 8, 2023), www.economist.com/leaders/2023/11/08/time-to-take-a-wrecking-ball-to-realtors-fees-in-america.

and accessible to real estate brokers and their realtors or agents that comply with the rules of the MLS.[3] Brokers that are members of an MLS are required to list all properties for sale on the MLS.

6. The vast majority of MLSs are formally controlled by local REALTOR®[4] associations, and access to such MLSs is conditioned on brokers' agreement to follow all mandatory rules set forth in the NAR Handbook, including the rules at issue herein.

7. To carry out the conspiracy, NAR, an unnamed co-conspirator, allows brokers representing or otherwise working with home sellers and home buyers to use MLSs controlled by NAR on the condition that those brokers agree to adhere to and help implement and enforce the MLS's terms and conditions that significantly restrain competition. Specifically, NAR requires every listing broker (including Defendants) who lists a property on an MLS, to make a "blanket unilateral offer[] of compensation" to any broker who may work with a buyer in purchasing that property (the "buyer-broker"). This requirement, and related terms implementing the requirement set forth including in Policy Statement 7.23 in the NAR Handbook, is hereafter referred to as the "Buyer Broker Commission Rule."

8. The Buyer Broker Commission Rule compels home sellers to make offers of payment to compensate buyer brokers even when the buyer broker is working on behalf of the buyer, not the seller. Furthermore, the Buyer Broker Commission Rule requires that this offer be a blanket offer – *i.e.*, the exact same compensation terms must be simultaneously offered to every buyer broker without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer.

---

[3] *See* National Association of Realtors®, Handbook on Multiple Listing Policy (2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*1am0u9c*_gcl_au*OTEyNDA1NDUzLjE2OTk5MTA4Nzc ("NAR Handbook").
[4] The term "realtor" or "REALTOR®" is both a trademark owned by NAR and a valuable membership benefit that distinguishes members from all others in the real estate business.

9.      Because this blanket offer must be made available to every buyer broker using the MLS and can be compared by the buyer broker with the blanket offers that every other seller must post on the MLS, the Buyer Broker Commission Rule creates great pressure on sellers to offer a high commission that has long been maintained in this industry so that buyer-brokers will not "steer" buyers away from their property and to properties offering higher buyer-broker commissions.

10.     The Buyer Broker Commission Rule encourages and facilitates anticompetitive "steering" by buyer-brokers because it allows them to compare the terms offered for buyer-broker compensation and steer their clients to properties where the listing broker is offering higher commissions. Steering is a key reason why agent commissions remain high in the United States during the internet era, even as commissions in other countries have plummeted. Economic studies and literature document and confirm the prevalence and significance of steering.[5] A recent academic study found systematic and nationwide evidence that buyer agents steer clients away from properties that offer low buyer agent commissions.[6] The harm caused by actual steering is amplified by the perceived threat of steering.

11.     These anticompetitive effects are reinforced by the Buyer Broker Commission Rule's requirement that the offer of compensation be expressed as a percentage of the gross selling price of the home or a definite dollar amount and the Buyer Broker Commission Rule's prohibition on "general invitations by listing [*i.e.,* seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships."

---

[5] *See* Roger P. Alford & Benjamin H. Harris, *Anticompetition in Buying and Selling Homes*, Cato Institute (2021), *available at* www.cato.org/regulation/summer-2021/anticompetition-buying-selling-homes.
[6] *See* Jordan Barry, Will Fried & John William Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate* (Oct. 9, 2023), *available at* https://ssrn.com/abstract=4596391.

12.    These anticompetitive effects are further reinforced by NAR's rules providing that after the seller has received purchase offers, the listing broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2 states:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.

13.    NAR requires its members that own and operate an MLS to comply with the mandatory provisions in the NAR Handbook and Code of Ethics. Failure to strictly comply with the Code of Ethics can lead to expulsion from NAR:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[7]

14.    NAR further penalizes and discourages potential non-compliance with the Buyer Broker Commission Rule by withholding professional liability insurance from any associations operating under any bylaws or rules that are not approved by NAR.[8]

15.    NAR reviews the governing documents of its local realtor associations to ensure compliance with NAR rules. NAR further requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.[9]

---

[7] National Association of Realtors®, Code of Ethics and Arbitration Manual 2019, at 1, *available at* www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.
[8] NAR Handbook, at 8.
[9] Only a small percentage of MLSs are not exclusively owned or operated by NAR and its affiliated realtor associations. These MLSs are nevertheless typically controlled by REALTOR®

16.     Upon information and belief, franchise agreements between the Defendants and their franchisees require those franchisees and their agents to: (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local realtor association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules in the NAR Handbook.

17.     Executives of the Defendants real estate broker firms have actively participated in the management, operations and governance of NAR and local and regional NAR affiliates. Through these positions, they have facilitated the conspiracy's implementation by enforcing compliance with the Buyer Broker Commission Rule while also instituting standard form contracts to insure enforcement of NAR mandates.

18.     Each Defendant assists NAR with ensuring compliance with the NAR rules. Local realtor associations and the NAR Board of Directors are responsible for the enforcement of NAR's MLS rules and regulations. As detailed herein, representatives from Defendants serve on NAR's Board of Directors and the boards of local realtor associations and/or are actively involved with local realtor associations.

19.     The Defendants and co-conspirators have joined the Florida MLSs and participated in their governance through the boards of Florida Realtors and local realtor associations and MLSs. The Defendants, Florida REALTORs®, and the co-conspirators have maintained, enforced, and adhered to the Florida Realtor MLSs anticompetitive rules, policies, and practices.

20.     Each Defendant also has agreed to participate in, implement, or facilitate the

---

associations and or NAR-aligned brokerages and promulgate rules similar to the Buyer Broker Commission Rule.

conspiracy by imposing NAR's rules, including the Buyer Broker Commission Rule, on its franchisees, affiliates, and realtors. Each Defendant mandated or encouraged its franchisees, affiliates, and realtors to join NAR and follow NAR's Code of Ethics and join a local realtor association or MLS, which requires compliance with the Buyer Broker Commission Rule. Each Defendant requires its realtors and franchisees to abide by NAR rules as a condition of doing business with the broker Defendants, and to secure the benefits of the Defendants' brands, infrastructure, and other resources that support their brokerage operations.

21.     Both NAR's Handbook and its Code of Ethics were drafted, developed, and promulgated by the NAR Board of Directors or NAR's Professional Standards Committee. The Defendants use their leadership roles in NAR or local realtor associations to implement the conspiracy.

22.     By enforcing the Buyer Broker Commission Rule and the related Standards of Practice rule through NAR or local realtor association leadership, imposing the Buyer Broker Commission Rule on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations and MLSs, and comply with their rules, each Defendant has agreed to participate in the conspiracy.

23.     The Defendants' conspiracy has burdened home sellers with costs that would either not exist or be paid by buyers in a competitive market. Furthermore, because most buyer-brokers will not show homes to their clients where the seller is offering a lower buyer-broker commission, or will show homes with higher commission offers first, sellers are incentivized when making required blanket offers to procure the buyer-brokers' cooperation by offering high commissions. Thus, the conspiracy: (a) requires sellers to pay overcharges for services provided by buyer-brokers; (b) raises, fixes and maintains buyer-broker compensation at levels that would

not exist in a competitive marketplace; and (c) encourages and facilitates steering and other actions that impede entry and market success by lower-cost real estate brokerage services.

24.     Absent the Buyer Broker Commission Rule, buyers would have the incentive to set and negotiate buyer broker pricing (where such brokers are used at all), and buyer brokers would compete to be retained by offering lower commissions to their prospective clients for their services. The Buyer Broker Commission Rule restrains price competition among buyer brokers because the clients retaining the buyer broker, *i.e.*, home buyers, have little incentive or ability to reduce their broker's commission because they are not paying the commissions.

25.     In a competitive market, sellers would pay nothing to buyer brokers, who would instead be paid by the buyers (their clients), and the total commission paid by a seller would be set at a level to compensate only the seller's broker. In a competitive market, buyer brokers would also compete with one another, including by potentially offering a lower commission rate. Indeed, in competitive foreign markets, including the United Kingdom, Germany, Israel, Australia, and New Zealand, if home buyers decide to use a broker, they (rather than home sellers) pay that broker less than half the rate paid to buyer brokers in California.

26.     A 2015 report commissioned by the NAR to study negative emerging trends in the real estate industry highlighted concerns that total commissions in the United States are inflated compared to various international markets. According to this report, the average total commissions range between 1% and 3% in countries such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium.[10]

27.     Many home buyers no longer require the help of a broker to search for prospective

---

[10] Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

homes. Instead, buyers can start their search process by using online services such as Zillow or Redfin and are increasingly retaining a buyer broker after having already found a target home.

28.     Despite the diminishing role of buyer brokers, commissions for buyer brokers have held steady in the 2.5% to 3% range because of conspiracy alleged herein. Furthermore, because housing prices significantly increased during the Class Period and because commissions are calculated as a percentage of the home's sales price, the actual dollar amounts of buyer commissions substantially increased during the Class Period. Thus, the dollar amount of commissions is increasing at the same time the work done by buyer brokers is decreasing.

29.     Although transaction costs are dramatically decreasing in other sectors and industries that benefit from technological advances, real estate commission rates have persisted generally in the 5% to 6% range. Because these commissions are set via blanket offers agreed to prior to a home being listed, buyer brokers receive the same percentage amount regardless of their efforts, thereby stifling competition.

30.     Because buyer brokers will not show homes to their clients where the seller broker is offering a lower buyer-broker commission or will show such homes later in the search process, seller brokers face pressure in making their unilateral blanket offers to provide high commissions to buyer brokers.

31.     Moreover, in the absence of the Buyer Broker Commission Rule, seller brokers would likely face additional competitive pressures. Instead of following the long-time practice of setting total commissions at or near 5% to 6%, and assigning roughly half of that amount to themselves and roughly the other half to the buyer broker (and selecting that amount at a level to remain in the good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another

to lower their rates and/or provide additional services to justify their rates.

32.     The Defendants' conspiracy has inflated buyer-broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiff and other home sellers. Plaintiff and the other class members have each incurred, on average, thousands of dollars in overcharges as a result of the Defendants' conspiracy. In a competitive market, buyers would have the incentive to set and negotiate buyer-broker prices, and the total commissions paid in any transaction, including the commissions paid by sellers would be lower.

33.     Plaintiff, on behalf of itself and a class of others similarly situated, brings this suit for damages caused by the Defendants' violations of the Sherman Act as alleged herein, and seek treble damages and the costs of this lawsuit, including reasonable attorneys' fees, and demands a trial by jury.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants. The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and 28 U.S.C. §§ 1331, 1337.

35.     This Court has personal jurisdiction over the Defendants. Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District, and/or (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

36.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d). The Defendants have transacted business, have been found, had agents in and/or resided in this District; a substantial part of the events giving rise to the class's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**PARTIES**

A.      **Plaintiff**

37.     Plaintiff Land Trust 2020 Continental Avenue, #221, sold a home located in Tallahassee, Florida, in August 2022. Plaintiff's home was listed for sale on the Tallahassee Board of Realtors MLS. Upon closing the sale of the home, Plaintiff paid 6% in realtor commissions: 3% to the seller's agent and 3% to the buyer's agent.

38.     As set forth herein, Defendants' unlawful conduct and conspiracy caused Plaintiff to pay a buyer-broker commission and artificially increased the amount of the total commission to a rate higher than it would have been in a competitive market.

B.      **Defendants**

39.     Defendant Watson Realty Corp. ("Watson Realty") is a "full-service real estate brokerage firm" that serves Northeast Florida, Central Florida and Southeast Georgia with over 1400 sales associates in more than 50 offices. It is a privately held Florida corporation headquartered in Jacksonville and is one of the nation's largest independent real estate companies.

40.     Defendant Premiere Plus Realty Co. ("Premiere Plus Realty") is a privately owned real estate company serving Southwest Florida with over 1500 professional agents and six staffed locations. In 2023, Premiere Plus closed around 5000 transactions and had nearly $3 billion in sales. It is a Florida corporation headquartered in Naples.

41.    Defendant MVP Realty Associates, LLC ("MVP Realty") is a privately owned full-service real estate brokerage with over 1200 Realtors spread over 22 offices throughout the state of Florida. In 2023, MVP Realty had over $2 billion in sales and closed a little over 6000 transactions. It is a Florida limited liability company headquartered in Naples.

42.    Defendant Higher Tech Realty FL, LLC ("Higher Tech Realty FL") is a Florida limited liability company headquartered in Maitland, Florida and doing business as Mark Spain Realty, the "#1 Real Estate Team in the US for Closed Transactions" according to the *Wall Street Journal* and Real Trends. It has offices in Tampa and Orlando.

43.    Defendant Florida Homes Realty & Mortgage, LLC ("Florida Homes Realty") is the largest single-broker firm in Northeast Florida with over 2700 agents across the state. It is a limited liability company headquartered in Jacksonville.

44.    Defendant Downing-Frye Realty, Inc. ("Downing-Frye Realty") has served southwest Florida for over 50 years and consistently ranks amongst the top 100 real estate offices in the United State based on sales volume. It is a Florida corporation headquartered in Naples.

45.    Defendant Charles Rutenberg Realty, Inc. ("Charles Rutenberg Realty") serves the Tampa Bay area with over 2500 agents spread across west-central Florida. It is a Florida corporation headquartered in Clearwater, Florida.

46.    Defendant Smith & Associates Real Estate, LLC ("Smith Real Estate") employs over 250 agents spread across five offices throughout the Tampa Bay area. It is a Florida limited liability company headquartered in Tampa and had $2.15 billion in total volume in 2022, selling nearly 2400 properties.

47.    Defendant Michael Saunders & Company ("Michael Saunders") "is the number one real estate broker in Southwest Florida" and a multi-billion-dollar business with over 20

branch offices and over 600 agents throughout the region. It is a Florida company headquartered in Sarasota.

48.     Doe Defendants 1-50 are members of the conspiracy alleged herein whose identities are presently unknown to Plaintiff. These include, among other entities, other local realtor associations and real estate brokers who agreed to implement the Buyer Broker Commission Rule when listing homes for sale on an MLS. Plaintiff expects that the identity of these Doe Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend the complaint to add those entities in place of the Doe Defendants.

### C.     NAR and Unnamed Co-Conspirators

49.     In addition to the named Defendants, NAR participated as a co-conspirator in the conspiracy alleged herein. NAR describes itself as "America's largest trade association, representing 1.5 million+ members, including NAR's institutes, societies, and councils, involved in all aspects of the residential and commercial real estate industries."[11] During the Class Period, NAR collected hundreds of millions of dollars in dues and membership fees. NAR oversees fifty-four state and territorial realtor associations and approximately 1,200 local realtor associations.[12]

50.     Each of NAR's 1.5 million + members pay annual dues of $150, thus generating annual revenue of approximately $240 million for NAR.

51.     Keller Williams Realty, Inc. ("Keller Williams") participated as a co-conspirator in the conspiracy alleged herein. Keller Williams is one of the nation's largest real estate brokerages. Headquartered in Austin, Texas, Keller Williams is a privately held company. It

---

[11]     National Association of Realtors®, NAR Fact Sheet, *available at* www.nar.realtor/newsroom/nar-fact-sheet.
[12] *About Florida Realtors*, FLORIDAREALTORS.ORG, Feb. 15, 2024, www.floridarealtors.org/about.

franchises local Keller Williams brokers around the country, which have approximately 700 offices and more than 120,000 sales associates.

52.     Anywhere Real Estate Inc. ("Anywhere Real Estate"), formerly known as Realogy Holdings Corp., participated as a co-conspirator in the conspiracy alleged herein. Anywhere Real Estate is the nation's largest real estate brokerage company. Headquartered in Madison, New Jersey, Anywhere Real Estate is a publicly traded corporation with a market value of over $4 billion. It owns, operates, and franchises real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate.

53.     RE/MAX Holdings, Inc. ("RE/MAX") participated as a co-conspirator in the conspiracy alleged herein. RE/MAX is one of the nation's largest real estate brokerages. It is headquartered in Denver, Colorado. RE/MAX is publicly traded and has a market value of approximately one billion dollars. It franchises local RE/MAX brokers around the country, which have approximately 6,800 offices and more than 100,000 sales associates.

54.     Realty ONE Group, Inc. ("Realty ONE") participated as a co-conspirator in the conspiracy alleged herein. Realty ONE is a real estate brokerage and franchising company headquartered in California and incorporated in Nevada. The company operates in 49 states, Washington D.C., and sixteen countries and territories with over 19,000 agents. The company and/or its franchisees transacts substantial business in this district.

55.     Multiple franchisees and local brokers affiliated with the Corporate Defendants participated as co-conspirators in the conspiracy alleged herein and performed acts and made statements in furtherance thereof.

56.     Local realtor associations and MLSs not named as Defendants also participated as

co-conspirators in conspiracy alleged herein and performed acts and made statements in furtherance thereof by adopting the Buyer Broker Compensation Rule or a similar rule.

57.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as Defendants in this Complaint.

## FACTUAL ALLEGATIONS

### I.     Real Estate Industry Background

58.     State licensing laws regulate who can represent buyers and sellers in real estate transactions. There are two categories of licensees: (1) the real estate broker, also known as a "brokerage firm," and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

59.     Licensed brokers are the only entities permitted by state law to be paid for representing buyers or sellers in a real estate transaction. This explains why real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through the brokers.

60.     Most brokers and their individual realtors or agents occupy dual roles: a broker may act as a seller broker for some home sales and as a buyer broker for other home sales.

61.     According to NAR, 89% of sellers sold their home with the assistance of a real estate agent in 2023, and 89% of buyers purchased their home with the assistance of a real estate agent or broker in 2023.[13]

62.     In typical residential real estate transactions, real estate brokers and agents receive

---

[13] National Association of Realtors®, Highlights From the Profile of Home Buyers and Sellers (2023), *available at* www.nar.realtor/research-and-statistics/research-reports/highlights-from-the-profile-of-home-buyers-and-sellers

their compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home is sold.

63.     A seller broker's compensation is set forth in a listing agreement, a contract between the seller and the seller broker. The listing agreement includes the terms of the listing and often provides that the seller broker has the exclusive right to market the seller's home.

64.     Home buyers retain brokers pursuant to written contracts that typically disclose that the buyer broker will be compensated by receiving a commission from the seller. The seller broker then pays the buyer broker a commission out of the total commission paid by the seller in connection with the home sale.

65.     The NAR Handbook and Code of Ethics require residential real estate sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home on any MLS owned or controlled by a local NAR association. If a buyer, represented by a buyer broker, purchases residential real estate, under such a non-negotiable offer of compensation, then the buyer broker receives the offered compensation as outlined in the listing agreement. This is described in the NAR Handbook Section 2-G-1 which provides, in relevant part:

> In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[14]

66.     The NAR Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers

---

[14] NAR Handbook, at 69.

to other participants to discuss terms and conditions of possible cooperative relationships."[15]

67.     The NAR Board of Directors, and the committees reporting to it, determine from time to time whether to modify any policies in the NAR Handbook and has approved certain changes in recent years.

68.     Section 2-G-1 shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust [sic] Act that keeps buying agents paid though they offer almost no useful services."[16]

69.     Section 2-G-1's requirement that the seller broker make a blanket, unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering a high commission for the buyer broker. Brokers often act as a selling broker in one transaction but as a buyer broker in another, which further contributes to the anticompetitive effects of the rule in that it fosters an environment in which brokers work cooperatively to split a total commission, instead of openly competing to earn the business of both potential home sellers and potential home buyers based solely on the services to be provided to that represented party.

70.     To foreclose the possibility that a buyer might seek to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer, NAR adopted Standard Practice 16-16:

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to

---

[15] *Id.*, at 40.
[16] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), *available at* www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

> subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[17]

In other words, a buyer-broker offer to a seller that is conditional on the seller reducing the buyer-broker commission expressly violates NAR's ethics rules.

## II.    Litigation Concerning NAR's Rules

71.    In 2019, a class action was filed against NAR and real estate brokers in the Western District of Missouri alleging that NAR rules violate the Sherman Act by inflating home seller commission rates. *Burnett et al v. National Association of Realtors, et al.*, Civil Action No. 4:19-cv-00332-SRB (W.D. Mo.). The defendants' motion to dismiss was denied in October 2020, and the class was certified in April 2022.

72.    On December 16, 2022, the court denied the motions for summary judgment and trial commenced on October 16, 2023.

73.    The case proceeded to trial and, on October 31, 2023, a jury found that a conspiracy existed among Defendants NAR, HomeServices of America, BHH Affiliates, HSF Affiliates, Keller Williams, Anywhere Real Estate, and RE/MAX to follow and enforce the NAR's rules, that the conspiracy had the effect of raising, inflating or stabilizing broker commission rates paid by home sellers in violation of the Sherman Act, that the Class members paid more for real estate brokerage services than they would have absent the conspiracy, and awarded over $1.7 billion in damages.

74.    In March 2024, NAR agreed to waive its right to appeal the jury verdict and settled for $418 million and injunctive relief that included eliminating its anticompetitive rules, including

---

[17] National Association of Realtors®, Code of Ethics and Standard of Practice (Jan. 1, 2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf?_gl=1*1lnx2bs*_gcl_au*MTMwMTE3OTY5NC4xNjk5MDc2ODI2

the Buyer Broker Commission Rule.

75.     Keller Williams reached a settlement of $70 million and agreed to implement the injunctive relief set forth in the NAR settlement agreement.

76.     RE/MAX reached a settlement of $55 million and agreed to implement the injunctive relief set forth in the NAR settlement agreement.

77.     Anywhere reached a settlement of $83.5 million and agreed to implement the injunctive relief set forth in the NAR settlement agreement.

78.     In April 2024, Realty ONE reached a settlement of $5 million in *Gibson, et al. v. National Association of Realtors*, Case No. 23-CV-788 (SRB) (W.D. Mo.) and agreed to implement the same injunctive relief as set forth in the NAR settlement agreement.

III.    **Defendants' Participation in the Conspiracy**

79.     In 1992, NAR adopted the Buyer Broker Commission Rule as part of the NAR Handbook.

80.     The NAR Board of Directors, and the Multiple Listing Issues and Policies Committee reporting to it, periodically determine whether to modify any policies in the NAR Handbook. The policies that are retained and any modification to them are set forth in new editions of the NAR Handbook that are issued on or about an annual basis. The NAR Handbook has consistently and repeatedly retained the Buyer Broker Commission Rule in revised versions.

81.     In setting forth the MLS terms, NAR allows Defendants and other co-conspirators to participate in the MLS and to gain the benefits provided by NAR and the MLS but only on the condition that they join the conspiracy and agree to follow and enforce the anticompetitive restrains set forth in the NAR Handbook.

82.     The NAR's Handbook states that "Association and Association-owned MLSs

must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as members boards and to ensure coverage under the master professional liability insurance program."[18]

83.     The Buyer Broker Commission Rule is set forth in the NAR Handbook:

"In filing a property with the multiple listing services of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."[19]

The NAR Handbook further states that:

Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships." [20]

84.     Several Florida MLSs have adopted the Buyer Broker Commission Rule. Stellar MLS, which is a multiple listing service representing Orlando, Tampa, and other areas of Central Florida, as well as Puerto Rico, has adopted the Buyer Broker Commission Rule verbatim.[21]

85.     Miami Association of Realtors, Inc. Multiple Listing Service, which serves the Miami-Dade, Broward, Palm Beach and Martin counties, adopted a rule identical to the Buyer Broker Commission Rule, requiring listings to include blanket offers of compensation listed as a percentage of the gross sale or definite dollar amount.[22]

---

[18] NAR Handbook, at iii.

[19] *Id*., at 118.

[20] *Id*., at 40.

[21] *See* Stellar MLS Rules and Regulations (2023), at 37, *available at* https://rulespdf.stellarmls.com/

[22] *See* Miami Association of Realtors, Inc. Multiple Listing Service, Policies and Procedures - Rules and Regulations (2023), at 28-29, *available at* www.miamirealtors.com/wp-content/uploads/bsk-pdf-manager/2020/04/mls-rules-and-regulations.pdf

86.     Upon information and belief, the Northeast Florida Multiple Listing Service, Inc., which serves Duval, Clay, St. John's, Nassau and Putnam counties, has adopted a rule similar or equivalent to the Buyer Broker Commission Rule.

87.     M.L.S. of Naples, Inc., which serves Collier County, adopted a rule stating: "The compensation specified on listings published by the MLS shall be shown either as a percentage of the gross selling price or as a definite dollar amount."[23]

88.     Central Panhandle Association of Realtors, which serves serving the Bay, Calhoun, Washington, Holmes and Jackson counties, states, a adopted a rule identical to the Buyer Broker Commission Rule, and which further states: "A compensation amount must be stated in the clause placed in the Relator® Remarks."[24]

89.     The Buyer Broker Commission Rule and the Florida MLS rules cited above shift a cost to the seller that would be negotiated and set by the buyer in a competitive market. As the Consumer Federation of America has explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[25]

90.     The Defendants have agreed to adopt, implement, and enforce the Buyer Broker Commission Rule on their affiliated franchisees, brokers, and employees. By participating in an association which prevents members from allowing their associates to compete with one another for commissions, and by agreeing to follow and enforce these anticompetitive rules, the

---

[23] *See* M.L.S. of Naples, Inc. Multiple Listing Service Rules and Regulations (2023), at 24, *available at* www.nabor.com/page-data/files/pages/realtor-tools/mls-resources/mls-Rules-08-25-2023.pdf

[24] *See* Central Panhandle Association of Realtors®, Multiple Listing Service Rules (2023), at 24, *available at* www.cpar.us/clientuploads/MLS/CPAR_MLS_Rules_and_Regulations_2023.pdf

[25] Stephen Brobeck, Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice, CONSUMER FEDERATION OF AMERICA, 4 (2006), http://archives-financialservices.house.gov/media/pdf/072506sb.pdf.

Defendants joined the conspiracy and acted to further its implementation and enforcement.

91.     The Buyer Broker Commission Rule imposes a financial overcharge on sellers by requiring them to make a "blanket unilateral offer of compensation" to the buyer broker as a condition of listing their home on the MLS. As a result, listing brokers must make "blanket, unilateral, unconditional offers of compensation to their adversarial buyer brokers. Every MLS in the U.S. requires that listing brokers offer compensation to buyer brokers."[26]

92.     The Defendants implemented the conspiracy by requiring and/or encouraging their and franchisees' agents and realtors to comply with NAR's rules.

93.     Upon information and belief, franchise agreements between the Defendants and their franchisees require those franchisees and their agents to: (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local realtor association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules in the NAR Handbook.

94.     Upon information and belief, NAR scrutinized the governing documents of its local realtor associations, especially those in the MLSs, to affirm adherence to NAR regulations. To achieve this, the local NAR affiliates had to submit their governing documents to NAR for a compliance evaluation from time to time.

95.     Executives from the Defendants have actively participated in the management, operations and governance of NAR, local Florida Realtor associations, and local and regional NAR affiliates. Through these positions, they have facilitated the conspiracy's implementation by enforcing compliance with the Buyer Broker Commission Rule, while also instituting standard

---

[26] Douglas R. Miller, *Letter to DOJ/FTC*, CONSUMER ADVOCATES IN AMERICAN REAL ESTATE (CAARE), 5 (2018),
www.ftc.gov/system/files/documents/public_coments/2018/07/00052-147606.pdf.

form contracts to insure enforcement of NAR mandates. For example:

(a) **Watson Realty:** Watson Realty actively touts its Executive Management Team's experience serving in leadership roles in several local, regional, and national realtor associations.[27] A broker affiliated with Watson Realty's Orange Park, Florida, office is a 2024-25 Director of the Northeast Florida Association of Realtors. Similarly, a Watson Realty agent is a 2024-25 Director of the Northeast Florida Association of Realtors.[28] Other agents have served in leadership roles in the Northeast Florida Association of Realtors and RealMLS.

(b) **Premiere Plus Realty:** Agents of Premier Plus Realty serve on the Board of Directors for the Marco Island Area Association of Realtors.

(c) **MVP Realty:** An MVP Realty agent is currently the President of the Bonita Springs-Estero Realtors Association. Another has been a director of the Naples Area Board of Realtors since 2021 and has also served as the co-chair of the Naples Realtors Political Action Committee since 2013.

(d) **Higher Tech Realty FL:** Higher Tech Realty FL is a member of the Space Coast Association of Realtors.

---

[27] *Watson Realty Corp. Executive Management Team*, WATSONREALTYCORP.COM, www.watsonrealtycorp.com/executive-management-team/ (last accessed July 3, 2024).
[28] *Your NEFAR Leadership*, NEFAR, https://nefar.realtor/officers-directors/ (last accessed July 3, 2024).

(e) **Florida Homes Realty:** Florida Homes Realty is a member of 23 different regional NAR associations and MLS Boards in the State of Florida.

(f) **Downing-Frye Realty:** The managing broker of Downing-Frye Realty's Naples office was a former director representing Florida in NAR, a Board member and past President of the Naples Area Board of Realtors, and a Board member and past Chair of the Florida Realtors Association.

(g) **Charles Rutenberg Realty:** An agent is on the 2024 Board of Directors of the Florida Realtors Association.

(h) **Smith Real Estate:** The President and CEO is a past President of the Tampa Association of Realtors.

(i) **Michael Saunders:** The President served as President of the 2022-2023 Stellar MLS Board of Directors, the third largest MLS in the nation and the largest in Florida, and previously served as that Board's Vice President.

96.     Each Defendant assists NAR with ensuring compliance with the NAR rules. Local realtor associations and the NAR Board of Directors are responsible for the enforcement of NAR's MLS rules and regulations. As noted above, representatives from Defendants serve on NAR's Board of Directors, the Boards of local realtor associations and/or are actively involved with local realtor associations.

97.     The Defendants and co-conspirators have joined the Florida MLSs and participated in their governance through the boards of Florida Realtors and local realtor

associations and MLSs. The Defendants, the Florida Realtors, and co-conspirators have maintained, enforced, and adhered to the Florida Realtor MLSs anticompetitive rules, policies, and practices.

98.     Each Defendant has also agreed to participate in, implement, and/or facilitate the conspiracy by imposing NAR's rules, including the Buyer Broker Commission Rule, on its franchisees, affiliates, and realtors. Each Defendant mandated or encouraged its franchisees, affiliates, and realtors to join NAR and follow NAR's Code of Ethics and join a local realtor association and/or MLS, which requires compliance with the Buyer Broker Commission Rule and the other anticompetitive NAR Standards of Practice. Each Defendant requires its realtors and franchisees to abide by NAR rules as a condition of doing business with the broker Defendants, and to secure the benefits of the Defendants' brands, infrastructure, and other resources that support their brokerage operations.

99.     Both NAR's Handbook and its Code of Ethics were drafted, developed, and promulgated by the NAR Board of Directors or NAR's Professional Standards Committee. The Defendants use their leadership roles in NAR or local realtor associations to implement the conspiracy.

100.    By enforcing the Buyer Broker Commission Rule and the related Standards of Practice rule through NAR or local realtor association leadership, imposing the Buyer Broker Commission Rule on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations and MLSs, and comply with their rules, each Defendant has agreed to participate in and implemented and/or facilitated the conspiracy.

**<u>ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY</u>**

101.    Defendants' conspiracy has had the following anticompetitive effects nationwide:

(a)     Class Members paid inflated buyer broker commissions and inflated total commissions.

(b)     Class Members were forced to pay commissions to buyer brokers, thereby substantially inflating the cost of selling their homes.

(c)     Class Members were compelled to pay high buyer broker commissions to induce buyer brokers to show their homes to the buyer brokers' clients.

(d)     The retention of a buyer broker was severed from the setting of the broker's commission; the home buyer retained the buyer broker, while the home seller's agent sets the buyer broker's compensation.

(e)     Price competition among brokers to be retained by home buyers was restrained, as was price competition among brokers seeking to be retained to sell homes.

(f)     Competition among home buyers was restrained by their inability to lower buyer-broker commissions.

(g)     The Defendants profited from inflated buyer-broker commissions and inflated total commissions.

102.    There are no pro-competitive effects of the Defendants' conspiracy.

103.    Even if any alleged pro-competitive effects exist, they are substantially outweighed by the anticompetitive effects of the Defendants' conspiracy.

104.    Economic evidence shows that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer-broker commissions paid by Class Members, at levels above what would be paid in a competitive market. Economists Natalya Delcoure and Norm Miller

compared international real estate commissions with those in the United States,[29] and concluded the following:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[30]

They also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[31] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[32]

105.    In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller and buyer brokers) in most areas of the United Staes average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices and the decreasing role of the buyer broker during a time when many prospective home buyers have already scoured the market through online real estate marketplaces.

106.    The Buyer Broker Commission Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the standard commission practices and rates. They enable buyer brokers to identify and compare the buyer-broker compensation offered by every

---

[29] *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).
[30] *Id*. at 14.
[31] *Id*. at 17.
[32] *Id*. at 13.

Case 1:24-cv-22937-XXXX   Document 1   Entered on FLSD Docket 08/01/2024   Page 28 of 37
seller and then steer their clients toward homes offering higher commissions.

107.    As confirmed by economic studies and literature, steering has clear anticompetitive effects. Steering deters reductions from the standard commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

108.    Defendants have further exacerbated the anticompetitive effects of steering by implementing the requirement that buyer broker commissions be specified in only certain ways (*i.e.*, a percentage of the sale price), which makes it easy for individual realtors or agents to see and compare offers.

109.    The economic evidence demonstrates that Defendants' conduct operates to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise would in a competitive market.

110.    Defendants' conspiracy was designed to raise and maintain real estate commissions at elevated and supra-competitive levels. Defendants provided uniform training to seller brokers to obtain commission rates, on average, in the 5% to 6% range, and to split commissions roughly equally with buyer brokers. Because these commission offers are blanket offers and agreed to prior to listing the house, buyer brokers receive the same amount in commission regardless of the effort made, stifling competition.

111.    Despite significant changes in technology that should have substantially reduced commission charges, Defendants have managed to keep the standard real estate commission stabilized at around, on average, 5% to 6% throughout the Class Period.

## **MARKET POWER**

112.    The relevant service market for the claims asserted herein is the bundle of services

provided to home buyers and sellers by residential real estate brokers with MLS access. Defendants' control of the MLSs gives them the ability to impose the Buyer Broker Commission Rule and other anticompetitive rules on Class Members. Access to MLSs is critical for brokers to compete and provide services to home buyers and sellers in the geographic areas in which those MLSs operate.

113.    One relevant geographic market for the claims asserted herein is the United States. Most homes sold in the United States were listed on MLSs by brokers that are subject to the NAR MLS rules and ethics standards, as well as similar rules adopted by the non-NAR controlled MLSs. From 2015-2022, 86-92% of sellers listed their homes on an MLS.

114.    Other relevant geographic markets are the local and regional markets that comprise the areas served by an MLS. All brokers in each MLS area have the ability to view all other listings made on that MLS and to offer and accept blanket offers of compensation within that MLS and are subject to the rules imposed by that MLS, including those challenged here.

115.    The Defendants' influence over the MLSs gives them the ability to impose the Buyer Broker Commission Rule and other anticompetitive rules on Class Members and other market participants. Access to the MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate. As such, the bundle of services provided by residential real estate brokers with MLS access to homebuyers and sellers is a relevant service for the claims asserted in this Complaint.

116.    All brokers in each MLS can view all other listings made on that MLS and to offer and accept blanket cooperative compensation offers within that MLS. Likewise, all brokers in each MLS are subject to the rules imposed by that MLS, including those challenged here. As such, another set of relevant geographic markets are the local and regional markets that are no

larger than the area served by an MLS.

117.     According to the DOJ in 2020, "[T]he membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area."[33] More specifically, from 2015-2022, 86-92% of sellers listed their homes on an MLS. As such, Defendants, and other conspiring brokers in the areas in which the MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas.

118.     Defendants and their co-conspirators collectively have market power in each relevant market through their membership in and control of the local MLS and their dominant share of the local market.

## CONTINUOUS ACCRUAL

119.     During the four years preceding the filing of this Complaint, the Defendants repeatedly charged buyer-broker commissions and total commissions that were inflated because of the conspiracy. Plaintiff and Class Members were forced to pay these inflated commissions in connection with the sale of residential real estate listed on one of the MLSs. Each payment of these inflated commissions by Plaintiff and Class Members during the last four years injured them and gave rise to a new cause of action for that injury.

120.     During the past four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules nationwide.

## CLASS ACTION ALLEGATIONS

121.     Plaintiff brings this action individually and on behalf of all others similarly

---

[33] *See* Competitive Impact Statement, *U.S. v. National Association of REALTORS®,* Dec. 10, 2020, at p.4, available at: www.justice.gov/atr/case-document/file/1344346/download.

situated, and as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), on behalf of members of the following Class ("the Class" or "Class Members"):

> All persons and entities in the United States who, from August 1, 2020 through the present used a listing broker affiliated with any Defendant or Co-Conspirator in the sale of a home listed on an MLS and who paid a commission to a cooperating broker in connection with the sale of the home.

122. Excluded from the Class are Defendants, their officers, directors, and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

123. ***Numerosity***. The members of the Class are so numerous as to render their individual joinder impracticable. Although the precise number of Class Members is unknown, based upon information and belief Plaintiff alleges that the Class contains thousands of members. The true number of Class Members is known by Defendants, however, and, thus, may be notified of the pendency of this action through electronic mail, first class mail and/or by published notice.

124. ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained trial counsel highly experienced in complex litigation including complex antitrust class action litigation, and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interest in this action that is adverse or antagonistic to the interests of the Class.

125. ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class Members. These common legal and factual questions, each of

which also may be certified under Rule 23(c)(4), include but are not limited to the following:

      (a)     Whether the Defendants knowingly participated in the conspiracy;

      (b)     Whether Defendants' conspiracy caused Plaintiff and Class Members to pay inflated commissions;

      (c)     Whether Plaintiff and Class Members were injured as a result of Defendants' anticompetitive conduct;

      (d)     Whether Defendants; anticompetitive conduct was a material cause of Plaintiff's and Class Members' injuries;

      (e)     Whether the injury can be measured using evidence common to the Class;

      (f)     Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits; and

      (g)     Whether Plaintiff and Class Members are entitled to restitution and/or injunctive relief.

126.    ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

127.    ***Superiority***. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without

sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

128.    Furthermore, the Class may be certified under Rule 23 (b)(2) because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class as a whole.

## ANTITRUST INJURY

129.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class Members have sustained injury to their businesses or property, having paid buyer broker commissions and thus higher total commissions than they would have paid in the absence of Defendants' anticompetitive conduct, and as a result have suffered damages.

130.    There are no pro-competitive effects of Defendants' conduct that are not substantially outweighed by the anticompetitive effects.

131.    Economic evidence supports the conclusion that Defendants' anticompetitive conduct has resulted in Class Members paying buyer-broker commissions and total commissions that have been inflated to supra-competitive levels above what they would be in a competitive market.

132.    Defendants' conduct was a material cause of the injuries sustained by Plaintiff and Class Members.

133.    The injuries sustained by Plaintiff and Class Members as a result of Defendants' conduct are injuries of the type that the antitrust laws were intended to prevent.

134.    The injuries sustained by Plaintiff and Class Members as a result of Defendants' conduct are injuries of the type that the antitrust laws were intended to prevent.

**CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**15 U.S.C. § 1**

135.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

136.    The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.

137.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

138.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require home sellers to pay cooperating brokers and to pay an inflated amount.

139.    By adopting and implementing rules and regulations that require Class Members to make a blanket, unilateral offers of buyer broker compensation when listing a property on an MLS, Defendants unlawfully restrain trade by:

> (a)    Requiring Class Members to pay buyer-broker commissions, a cost that, in a competitive market, would be paid by the buyer;

> (b)    Preventing a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer; and

> (c)    Causing Class Members to pay inflated commissions.

140.    The conspiracy alleged herein consists of a continuing agreement or understanding

among Defendants to adopt, implement, and enforce rules and regulations for any realtor who lists a property for sale on an MLS. These rules require all Class Members to agree to make a blanket, unilateral offer of buyer broker compensation when listing a property on an MLS:

    (a)    The Buyer Broker Commission Rule forces Class Members to pay buyer-broker commissions, a cost that, in a competitive market, would be paid by the buyer.

    (b)    NAR Standard of Practice 3-2 prevents a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer.

    (c)    The Defendants restrain trade by enforcing policies and practices that artificially inflate commission rates.

141.    The Defendants' conspiracy has required sellers nationwide to pay buyer brokers, to pay an inflated buyer-broker commission and an inflated total commission and has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

142.    The Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid substantially lower commissions because buyers would have the incentive to set and negotiate buyer-broker prices (and buyer-broker commissions would not be at supra-competitive levels).

143.    The Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented and enforced by Defendants and co-conspirators nationwide. These

rules govern the conduct of local NAR associations, local brokers, and local realtors nationwide. Defendants' conduct alleged herein has inflated buyer-broker commissions nationwide and has injured home sellers in those areas and nationwide. NAR, through its members and other co-conspirators, and Defendants, through their subsidiaries, franchisees, brokers and other co-conspirators, are engaged in interstate commerce, and are engaged in conduct affecting interstate commerce throughout the United States.

144.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

145.    In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under the "Rule of Reason" analysis.

146.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of members of the Class, requests relief and prays for judgment against Defendants as follows:

(a)    An Order certifying the Class under the appropriate provisions of Rule 23 (b)(2) and (b)(3) of the Federal Rule of Civil Procedure;

(b)    An Order appointing Plaintiff as the Class representative and appointing his counsel as Class Counsel;

(c)    Declarations that the actions of Defendants, as set forth above, are unlawful and in violation of the Sherman Act;

(d)    An award to Plaintiff and the Class Members for actual damages trebled in an amount to be determined at trial;

(e)     A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any conduct determined to be unlawful;

(f)     An award to Plaintiff and the Class Members of pre- and post-judgment interest;

(g)     An award to Plaintiff and the Class Members for their costs of suit, including reasonable attorneys' fees and expenses; and

(h)     An award of such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a jury trial of all issues so triable.

Dated: August 1, 2024                    Respectfully submitted,

*/s/ Ryan J. McGee*
RYAN J. McGEE (Florida Bar No. 064957)
rmcgee@forthepeople.com
**MORGAN & MORGAN**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-0931

JILL M. MANNING (*pro hac vice forthcoming*)
jmanning@pwfirm.com
**PEARSON WARSHAW, LLP**
555 Montgomery St., Suite 1205
San Francisco, California 94111
Telephone: (415) 433-9000

*Attorneys for Plaintiff and the Proposed Class*